In re BUCYRUS GRAIN CO., INC., Debtor.

**STATE BANK OF SPRING HILL, Claimant,**

v.

**BUCYRUS GRAIN CO., INC., Debtor,**

**Carl Edward Anderson and Robert Emmett Anderson, Appellants.**

**Bankruptcy No. 84–20269.**
**No. 87–2253–0.**

United States District Court.
D. Kansas.

June 13, 1988.

Thomas L. Griswold and Michael P. Carpenter, Overland Park, Kan., for claimant.

Frederick B. Farmer, Olathe, Kan., for creditors.

James S. Willis, trustee, Kansas City, Kan.

C. Maxwell Logan, Shook, Hardy & Bacon, Overland Park, Kan., for debtor.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter is before the court on an appeal by Carl Edward Anderson and Robert Emmett Anderson (hereinafter "the Anderson Brothers") from a decision of the United States Bankruptcy Court for the District of Kansas. 67 B.R. 336. The question for consideration on appeal is whether the Anderson Brothers are entitled to priority as commodity customers as set forth in the commodity broker liquidation subchapter of the Bankruptcy Code.

Under 28 U.S.C. § 158(a), district courts of the United States have jurisdiction to hear appeals from final orders of bankruptcy judges entered in core proceedings. The standard of review on appeal is as follows:

> On an appeal the district court or a bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree, or remand with instructions for further proceedings. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

Bankruptcy Rule 8013. *See In re Reid,* 757 F.2d 230, 233–34 (10th Cir.1985). "When reviewing factual findings, an appellate court is not to weigh the evidence or reverse the finding because it would have decided the case differently.... A trial court's findings may not be reversed if its perception of the evidence is logical or reasonable in light of the record." *In re Branding Iron Motel, Inc.,* 798 F.2d 396 (10th Cir.1986). However, the clearly erroneous standard does not apply to the bank-

ruptcy court's conclusions of law: "[i]t is appropriate for the district court to review *de novo* the bankruptcy court's legal determinations." *Id.*

### I. *The Bankruptcy Court's Findings.*

Pursuant to the preceding authority, the following findings of fact are not clearly erroneous and will be considered by this court as true:

1. Bucyrus Grain Company, Inc. (hereinafter "Bucyrus"), is a Kansas corporation doing business as a grain elevator. Neither Bucyrus nor its president, James Creamer (hereinafter "Creamer"), was registered with the Commodities Futures Trading Commission as a futures commission merchant. Carl Edward Anderson is a farmer from Missouri, and Robert Emmett Anderson is a farmer from Kansas. The State Bank of Spring Hill (hereinafter "the bank") is a Kansas bank.

2. On or about October 26, 1983, in order to take advantage of special margin rates available to Bucyrus in the futures market, the Anderson Brothers solicited Bucyrus to purchase five July 1984 soybean futures contracts, and they delivered $25,000 to Creamer to acquire the contracts. Creamer purchased the futures contracts in the name of Bucyrus through the brokerage firm of Drexel, Burnham and Lambert, Inc. (hereinafter "Drexel, Burnham"). At the time Bucyrus acquired the futures contracts for the Anderson Brothers, Bucyrus also had its own commodity futures contracts acquired through Drexel, Burnham and another brokerage firm, Cargill Investors Services (hereinafter "Cargill"). Additionally, Bucyrus had acquired futures contracts for other customers of the elevator (although this fact is not included in the bankruptcy court's opinion, it is indicated by the record).

3. In late January 1984, Bucyrus closed out the Anderson Brothers' position and all of its own contracts in July beans.

4. Bucyrus had a checking account (hereinafter "the Bucyrus account") with the bank. On March 29, 1984, the Bucyrus account was overdrawn, and the bank received a wire transfer of $27,000 from Cargill for the Bucyrus account. The transfer represented partial proceeds from the liquidation of Bucyrus' positions acquired through Cargill.

5. On March 30, 1984, Creamer deposited a number of checks in the Bucyrus account, including a $30,026 check from Cargill. The check represented the remaining proceeds from the liquidation of Bucyrus' positions acquired through Cargill. Cargill stopped payment on the $30,026 check, and instead, wire-transferred the funds to the Bucyrus account on April 4, 1984. The Bucyrus account balance on March 30, 1984, was $46,421.20. The positive balance was the result of deposits made in the last two days before bankruptcy, namely, funds paid on accounts receivable for the sale of inventory and money from the Cargill account.

6. Bucyrus filed a bankruptcy petition on March 30, 1984.

7. At the time of the filing of the petition, Bucyrus owed the bank $780,068.65.

8. The bank held the following security for the Bucyrus debts:

A. Certificates of Deposit Nos. 10422 and 1043, held by the bank pursuant to a collateral deposit agreement dated July 22, 1982.

B. Miscellaneous weed control chemicals and seed soybeans, held pursuant to a security agreement dated April 26, 1979.

C. All accounts receivable and all inventory, held pursuant to a security agreement dated April 26, 1979.

D. All machinery and equipment, furniture and fixtures, inventory, accounts receivable, proceeds arising therefrom, chattel papers, contract rights, and general intangibles, however evidenced or acquired, and all additions and accessions thereto, held pursuant to a security agreement dated March 18, 1980.

9. The bank properly perfected the security interests in the Bucyrus property prior to the petition for bankruptcy.

10. In cooperation with the bankruptcy trustee, the bank has reclaimed part of the collateral and applied the proceeds from its sale to the outstanding debt. The remaining amount owed the bank by Bucyrus as of March 22, 1985, was $458,198.65.

## II. *Application of the Law.*

Under bankruptcy law, the customers of a bankrupt commodity broker receive preferential treatment. The commodity broker is prohibited from reorganization under Title 11, Chapter 11. *See* 11 U.S.C. § 109(d). Instead, the commodity broker must be liquidated under *Chapter 7, Subchapter IV.* The commodity customers are granted the highest priority against the bankrupt broker's estate, thereby furthering the purposes of the Commodity Exchange Act by enhancing customer protection and promoting customer confidence in commodity markets generally. *See* S.Rep. No. 95–989, 95th Cong., 2d Sess. 7–8, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5793–94. Thus, the Anderson Brothers' claim may have priority over the bank's claim if Bucyrus was a commodity broker.

Commodity broker is defined as a "futures commission merchant ... as defined in section 761 of this Title [11 U.S.C. § 761], with respect to which there is a customer, as defined in section 761(9) of this Title [11 U.S.C. § 761(9)]...." 11 U.S.C. § 101(5). 11 U.S.C. § 761(8) states that the term futures commission merchant has the meaning assigned to it by the *Commodity Exchange Act, 7 U.S.C. § 1, et seq.* That Act defines a futures commission merchant to mean and include

> individuals, associations, partnerships, corporations, and trusts engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market and that, in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trade or contracts that result or may result therefrom.

*7 U.S.C. § 2.*

The bankruptcy court determined that Bucyrus was not a futures commission merchant. The court reasoned that "[t]he phrase 'futures commission merchant' itself suggests that the broker is in the business of soliciting customers to invest on a commission basis." Bucyrus did not charge the Anderson Brothers a commission, and the Anderson Brothers purchased the futures contracts through Bucyrus in order to take advantage of the special margin rates available to elevators.

The court stated that a restrictive definition of futures commission merchant is supported by public policy, as Bucyrus and Creamer were not registered as futures commission merchants, and thus the transaction between Bucyrus and the Anderson Brothers was unlawful. *See* 7 U.S.C. § 6d. The court concluded that if the Anderson Brothers wanted the special protections provided in Chapter 7, they should have purchased directly from Drexel, Burnham, or a similar, commission charging, futures commission merchant.

The Anderson Brothers contend that the bankruptcy court erroneously concluded that Bucyrus was not a commodity broker with respect to its purchase of futures contracts for them. They argue that under the plain statutory language, Bucyrus was a futures commission merchant. Thus, the commodity broker liquidation subchapter of the Bankruptcy Code applies to their claim. The bank responds that the bankruptcy court correctly determined that Bucyrus was not a futures commission merchant, and therefore, the commodity broker liquidation subchapter does not apply.

■ The question of whether a grain elevator which accepts futures orders from its farmer/customers and accepts money to margin trades or contracts resulting from the orders is a commodity broker under Chapter 7 appears to be one of first impression. The Ninth Circuit apparently is the only court to consider the parameters of the definition of commodity broker. In *In re Co Petro Marketing Group, Inc.,* 680 F.2d 566 (9th Cir.1982), the Ninth Circuit considered whether the definition of a commodity broker includes an entity engaged in selling futures contracts in commodities

for which no officially designated or regulated market exists. *Id.* at 567. The court stated that

[a]ccording to the plain language of the Commodity Exchange Act, denomination as a futures commission merchant requires two conditions: 1) the individual, association, partnership, corporation, or trust must be dealing in orders for the purchase or sale of a commodity for future delivery, and 2) the commodity for future delivery dealt in must be on or subject to the rules of a contract market.

*Id.* at 569. The court held that although the entity met the first criterion, there was no contract market for the commodity futures. *See id.* at 569–72. In a standard commodity broker-customer relationship, "the customer is not dealing so much *with* the broker or dealer as *through* him. Thus, consideration of the broker or dealer's creditworthiness do [sic] not enter into the customer's decisions." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 265, *reprinted in* U.S.Code Cong. & Admin.News 5963, 6223. The court reasoned that the broker did not have a standard relationship with its customers: "[u]nlike standard commodities transactions in which brokers through existing futures exchanges merely execute orders on behalf of their customers, Co Petro made the market for its customers." *Co Petro*, 680 F.2d at 571. The customers therefore were dealing with, rather than through, the broker, and because Congress in the commodity broker liquidation subchapter sought to preserve only the traditional depositary relationship between brokers and their customers, the protections of the subchapter were unavailable to the customers. *See id.* at 571–72.

■ Given this background, the court is compelled to reverse the bankruptcy court's holding that Bucyrus was not a futures commission merchant. The statutory language is plain and unambiguous, *see id.* at 569, and it does not require a futures commission merchant to receive a commission. Rather, the merchant must (1) accept orders for the purchase or sale of any commodity for future delivery, as Bucyrus did in accepting soybean futures contracts, (2) deal in futures commodities subject to the rules of a contract market, as Bucyrus did in dealing in futures on the Chicago Board of Trade, and (3) in connection with the orders, accept money to margin the contracts, as Bucyrus did. *See* 7 U.S.C. § 2. A statute must be interpreted according to its plain language unless contrary congressional intent can be gleaned from the statute's legislative history. *Consumer Products Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980).

Nothing in the legislative history of the Act or the commodity broker liquidation subchapter indicates that Congress intended the definition of futures commission merchant to include only those persons or entities charging a commission to their customers. Rather, Congress' focus was on commodities markets and the need for stability and customer confidence. A holding that a person or entity qualifies as a futures commission merchant only if it receives a commission would undermine customer protection, customer confidence, and stability.

Further, the Anderson Brothers were, in one sense, traditional commodity customers. They were dealing through Bucyrus, rather than with Bucyrus, with respect to the soybean futures contracts. This traditional, depositary relationship was the focus of Congress when enacting the commodity broker liquidation subchapter. *See Co Petro*, 680 F.2d at 571–72.

■ The bankruptcy court expressed concern that the Anderson Brothers had knowingly solicited Bucyrus, an unregistered broker, to purchase the futures contracts in order to take advantage of the special margin rates available to Bucyrus. However, the Act proscribes only brokers who accept orders when unregistered; it does not address customers dealing with unregistered brokers. More importantly, nothing in the Act or the commodity broker liquidation subchapter or their legislative history indicates that a customer dealing with an unregistered broker should not be afforded the protections of the subchapter, even if the customer solicited the unregis-

tered broker's actions. Instead, as stated above, the primary concern of the Act and the subchapter is protection of commodity customers and commodity markets through insuring that the success of an investment in commodity futures depends on the performance of the futures, and not the performance of the broker through whom the customer deals. This concern overrides the bankruptcy court's concern regarding the propriety of the Anderson Brothers' use of Bucyrus to obtain special margin rates, and it is furthered by giving the Anderson Brothers priority under the commodity broker liquidation subchapter.

The regulations promulgated by the Commodities Futures Trading Commission support this court's conclusion that Bucyrus was a futures commission merchant even though it was unregistered:

"Commodity broker" means any person who is registered *or required to register* as a futures commission merchant under the Act including a person registered or required to be registered as such under Parts 32 and 33 of this chapter, and a "commodity options dealer," "foreign futures commission merchant," "clearing organization," and "leverage transaction merchant" with respect to which there is a "customer" as those terms are defined in this section.

CFTC Bankruptcy Regulations, 17 C.F.R. § 190.01(f) (1987). Additionally, regarding the conduct of a futures commission merchant, the commission has stated:

The purpose for which a futures contract is entered into and the scope of the activities of the person who solicits or accepts an order for the purchase or sale of the contract are irrelevant in determining whether such person should be registered as an introducing broker or FCM. It is sufficient if the person solicits or accepts such orders.

2 Comm.Fut.L.Rep. (CCH) ¶ 22,373 (CFTC Interpretive Letter Number 84-17).

In sum, the court finds that the plain language of the statute indicates that Bucyrus was a futures commission merchant, and the legislative history and the public policy considerations lend strong support to our conclusion.

■ Because the bankruptcy court determined that Bucyrus was not a futures commission merchant, it did not focus on the second requirement of the commodity broker definition, *see* 11 U.S.C. § 101(5), that is, whether the Anderson Brothers were a customer. 11 U.S.C. § 761(9) reads as follows:

(9) "customer" means—
(A) with respect to a futures commission merchant—
(i) entity for or with whom such futures commission merchant deals and that holds a claim against such futures commission merchant on account of a commodity contract made, received, acquired, or held by or through such futures commission merchant in the ordinary course of such futures commission merchant's business as a futures commission merchant from or for the commodity futures account of such entity; or
(ii) entity that *holds a claim against* such futures commission merchant arising out of—

. . . . .

(II) a deposit or payment of cash, a security, or other property with such futures commission merchant for the purpose of making or margining such a commodity contract....

*Id.* at § 761(9).

The Anderson Brothers dealt with and held a claim against Bucyrus as a result of a futures contract and a deposit of cash to margin the contract. Although Bucyrus' ordinary course of business did not include acting as a futures commission merchant, the Anderson Brothers' dealings with Bucyrus as a futures commission merchant were in the *ordinary course of Bucyrus'* limited business as a futures commission merchant. Thus, the Anderson Brothers were a customer, and Bucyrus was a commodity broker.

■ Having determined that Bucyrus was a commodity broker, the court must examine the propriety of the bankruptcy

court's holding that the funds in the Bucyrus account were not customer property. 11 U.S.C. § 766(h) states that:

the trustee shall distribute customer property ratably to customers on the basis and to the extent of such customers' allowed net equity claims, and in priority to all other claims, except claims of a kind specified in section 507(a)(1) of this title [11 USCS § 507(a)(1)] that are attributable to the administration of customer property. Such distribution shall be in the form of—

(1) cash;

(2) the return or transfer, under subsection (c) or (d) of this section, of specifically identifiable customer securities, property, or commodity contracts; or

(3) payment of margin calls under subsection (a) of this section.

*Id.* at § 766(h). Customer property is defined in 11 U.S.C. § 761(10):

"customer property" means cash, a security, or other property, or proceeds of such cash, security, or property, received, acquired, or held by or for the account of the debtor, from or for the account of a customer—

(A) including—

(i) property received, acquired, or held to margin, guarantee, secure, purchase, or sell a commodity contract;

(ii) profits or contractual or other rights accruing to a customer as a result of a commodity contract;

(iii) an open commodity contract;

(iv) specifically identifiable customer property;

.    .    .    .    .

(viii) property that was unlawfully converted from and that is the lawful property of the estate ...

(B) not including property to the extent that a customer does not have a claim against the debtor based on such property[.]

*Id.* at § 761(10).

The bankruptcy court's findings of fact indicate that the funds in the Bucyrus account were from accounts receivable and from the liquidation of Bucyrus' account with Cargill. The court concluded that because Bucyrus purchased the futures contracts for the Anderson Brothers from Drexel, Burnham, no funds in the Bucyrus account were the Anderson Brothers' customer property.

The Anderson Brothers contend that the bankruptcy court erred because customer property need not be traceable or specifically identifiable. The bank asserts that the bankruptcy court's holding was correct because the Anderson Brothers do not have a claim to any of the funds in the Bucyrus account.

Under sections 761(10) and 766(h), a customer need not specifically identify property to recover from a customer account. *See* S.Rep. No. 95–989, 95th Cong., 2d Sess. 106, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5892; H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 393, 1978 U.S. Code Cong. & Admin.News 5963, 6349. However, the issue in the instant case is whether the Anderson Brothers may recover from a bank account which holds funds that, although not specifically identifiable, may be traced to other commodity customers and other sources. The funds traceable to accounts receivable payments are not at all related to Bucyrus' transactions as a commodity broker, and these funds should be disregarded when considering the Anderson Brothers' claim. Nevertheless, the funds traceable to the Cargill account exceed the Anderson Brothers' claim, and the court must determine if the Anderson Brothers may make a valid claim as to these funds.

The court is of the opinion that the Anderson Brothers' claim against these funds is valid. The funds are not specifically identifiable property, and thus they are not subject to the treatment outlined in 11 U.S.C. § 766(c) (a customer may receive specifically identifiable property from the trustee, but the receipt is a part of, rather than in addition to, the ratable share of property the customer is entitled to receive given his net equity, *see* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 393, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6349). Instead, the funds should be a part

**52**

of the customer property to be apportioned among customers on the basis of their net equity claims. *See* 11 U.S.C. § 766(h). The fact that the funds were attributable to Bucyrus' dealings with Cargill, rather than Drexel, Burnham, is irrelevant. Customers with futures contracts that Bucyrus happened to place through Drexel, Burnham should not be disadvantaged merely because Bucyrus happened to squander away the funds associated with these accounts prior to petitioning for bankruptcy. All of the funds in the Bucyrus account that are attributable to Bucyrus' commodity futures activity should be available for apportionment among all of Bucyrus' commodity customers.

Thus, the Bucyrus account includes customer property against which the Anderson Brothers may make a valid claim. However, the court will not address the issue of whether the Anderson Brothers are entitled to the full value of their net equity claim given the fact that no other commodity customers made claims under the commodity broker liquidation subchapter, as the bankruptcy court did not reach the issue and the parties did not extensively brief the issue.

Finally, given the above analysis, the court need not address the Anderson Brothers' other claims on appeal, namely that they have a constructive trust in the Bucyrus account which is superior to the bank's statutory right to setoff, and that the bank's security interests do not defeat the Anderson Brothers' claim.

The case will be remanded to the bankruptcy court for determination of whether the Anderson Brothers should receive the full value of their net equity claim, or whether they are entitled only to a pro rata share of the Bucyrus account.

IT IS THEREFORE ORDERED that the decision of the bankruptcy court is reversed and the case is remanded to determine what portion of the Bucyrus account the Anderson Brothers may recover.